**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

CASE NO. _____

**FEDERAL DEPOSIT INSURANCE**
**CORPORATION, AS RECEIVER FOR**
**INDYMAC BANK, FSB,**

Plaintiff,

v.

**MIGUEL F. MIRABAL, GLOBAL TITLE,**
**LLC, ECONO APPRAISAL INC.,**
**ROBERTO RODRIGUEZ, LANCE**
**MOYSE, and ATTORNEYS' TITLE**
**INSURANCE FUND, INC.,**

Defendants.

_____/

## COMPLAINT

Federal Deposit Insurance Corporation (**FDIC**), as Receiver for IndyMac Bank, FSB

(**IndyMac**) (collectively, **Plaintiff**), sues Miguel F. Mirabal (**Mirabel**), Global Title, LLC

(**Global Title**), Econo Appraisal Inc. (**Econo Appraisal**), Roberto Rodriguez, Lance Moyse

(Econo Appraisal, Rodriguez, and Moyse, collectively the **Appraiser**), and Attorneys' Title

Insurance Fund, Inc. (**Attorneys' Title**), and alleges the following:

## GENERAL ALLEGATIONS

### — OVERVIEW —

1.      Melissa Cuebas purchased unit 1203 (**Unit 1203**) in the "Mark on Brickell" condominium

complex, located at 1155 Brickell Bay Drive, Miami, Florida.

2.    IndyMac funded the entire purchase price for Cuebas' purchase of Unit 1203.

3.    At all relevant times, Mirabal was president and director of Global Title (Mirabal and Global Title, collectively, the **Closing Agent**).  The Closing Agent was hired to close Cuebas' purchase of Unit 1203.

4.    The Closing Agent breached multiple provisions of IndyMac's closing instructions by disguising a prior sale of Unit 1203 to conceal the transaction from IndyMac.  These breaches obscured the true value of Unit 1203 and induced IndyMac to fund Cuebas' mortgage loans.

5.    Plaintiff attempted to seek reimbursement of the actual losses it suffered from the Closing Agent's breaches under the closing protection letter (**CPL**) Attorneys' Title issued to IndyMac for this transaction.  Despite Plaintiff's multiple requests, Attorneys' Title has refused to reimburse Plaintiff for its actual losses.

6.    The Appraiser entered into a valid contract with 1st Continental Mortgage Inc. (**1st Continental**) to provide an appraisal of Unit 1203 for IndyMac's benefit.  The Appraiser negligently prepared the appraisal, inflating the value of the property.  This inflated value induced IndyMac to fund mortgage loans that were severely under-secured.  IndyMac would not have funded the loans but for the negligently inflated value.

7.    Plaintiff ultimately had to sue to foreclose the collateral.  Due to the Closing Agent's and the Appraiser's breaches of duty, the mortgages are severely under-secured and Plaintiff will only be able to recover a fraction of the loan debt through the foreclosure.

8.    Plaintiff brings claims in tort and contract against the Closing Agent and the Appraiser for their breaches of duty.  Plaintiff brings a contract claim against Attorneys' Title for breaching the terms of the CPL.

{JA468792;5}

9.     Plaintiff seeks damages against the Closing Agent, the Appraiser, and Attorneys' Title for these breaches, including the unpaid balance of the mortgage loans and the continued accrual of interest, fees and other compensable losses.

— **PARTIES** —

10.     Plaintiff Federal Deposit Insurance Corporation is the receiver for IndyMac Bank, FSB, which was a federal savings bank with its principal place of business in Pasadena, California.  IndyMac was closed by the Office of Thrift Supervision, which transferred IndyMac's operations to the FDIC on July 11, 2008.

11.     Defendant Miguel F. Mirabal is a Florida resident and former president and director of Global Title.

12.     Defendant Global Title, LLC was a corporation organized under the laws of the state of Florida, with a principal place of business located at 27392 Anguilla Lane, Ramrod Key, Florida 33042.  Global Title dissolved on November 8, 2007.

13.     Defendant Econo Appraisal Inc. is a corporation organized under the laws of the state of Florida, with a principal place of business located at 14225 SW 37th Street, Miami, Florida 33175.

14.     Defendant Roberto Rodriguez is a Florida resident and certified residential appraiser, with his principal place of business located at 14225 SW 37th Street, Miami, Florida 33175.  Rodriguez served as the supervisor appraiser for the Cuebas transaction and was Econo Appraisal's sole principal at all relevant times.

15.     Defendant Lance Moyse is a Florida resident and a former registered trainee appraiser, with his principal place of business located at 14225 SW 37th Street, Miami, Florida 33175.  Moyse served as the trainee appraiser for Cuebas' transaction.

{JA468792;5}

3

16.   Defendant Attorneys' Title Insurance Fund, Inc. is a corporation organized under the laws of the state of Florida and regularly conducts business in Miami-Dade County, Florida.

## — JURISDICTION AND VENUE —

17.   This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 and 12 U.S.C. § 1819(b)(2)(A), because this controversy arises under the laws of the United States.

18.   Venue is proper in the Southern District of Florida under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to the claims occurred in this district and the property that is the subject of the action is situated in this district.

## FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

### — FINANCING THE PURCHASE —

19.   Cuebas purchased Unit 1203 for $825,000.

20.   IndyMac funded the entire amount of $825,000 for Cuebas' purchase, including $660,000 pursuant to a first mortgage loan and $165,000 pursuant to a second mortgage loan.

### — THE CLOSING —

21.   The Closing Agent closed Cuebas' purchase of Unit 1203.

22.   The Closing Agent sent IndyMac a HUD-1 for approval on February 28, 2007, which IndyMac approved on the same day (the **Authorized HUD-1**).  The Authorized HUD-1 listed Ricardo Morales (**Morales**) as the seller of Unit 1203.

23.   The Authorized HUD-1's accuracy was critical.  The Authorized HUD-1 served as a blueprint of Cuebas' transaction, which IndyMac relied on to fund her purchase.

24.   After approving the Authorized HUD-1, IndyMac funded Cuebas' loans to purchase Unit 1203 at the closing on February 28, 2007.

25.    By conducting the closing of Unit 1203, the Closing Agent agreed to contractual and fiduciary duties for the benefit of IndyMac.  These duties are contained in the closing instructions IndyMac issued to the Closing Agent to close Cuebas' transaction.  The closing instructions are attached as **EXHIBIT A**.

26.    The closing instructions mandated strict compliance.  The instructions stated in part:

> **Closing Instructions**
>
> You are directed to follow these instructions in full, at which time you may request funds.  You are not authorized to close this transaction unless you can strictly comply with these instructions. These instructions can only be changed, modified or waived in writing…
>
> You are to make no changes to the documents without lender's written authorization.  All approved changes must be initialed by the borrowers and any other party to the instrument being changed.

27.    The closing instructions emphasized that once the Closing Agent requested that IndyMac disburse the mortgage loan proceeds for this transaction, the Closing Agent certified that it was prepared to comply with each of IndyMac's closing instructions:

> **DISBURSEMENT**
>
> 1.    It shall be the responsibility of the Closing Agent to request proceeds from the lender at such time as the Closing Agent is prepared to comply with all the terms and conditions of the… Lender's Closing Instructions.  Such a request, by the Closing Agent, for funds shall be deemed a certification to the lender that all terms and conditions have been met and that the documents will be properly recorded no later than the next business day after the day the closing agent has received the proceeds check or wire transfer.

{JA468792;5}

28.   The Closing Agent accepted the closing instructions, including all terms and fiduciary duties, by signing the closing instructions, closing Cuebas' transaction, and taking a fee for closing the transaction.

— **THE CLOSING AGENT'S BREACHES OF DUTY** —

29.   IndyMac's closing instructions provided:

> YOU ARE NOT AUTHORIZED TO CLOSE THIS LOAN IF: … you have knowledge of a transaction involving the subject property in the last 180 days.  Notify the lender, in writing, of the additional transaction to verify that it has been considered in our loan approval decision.

30.   Despite these explicit instructions, the Closing Agent closed Cuebas' purchase, even though the Closing Agent knew of another transaction involving Unit 1203 that closed approximately one month earlier.

31.   Prior to the closing of Cuebas' purchase, Morales sold Unit 1203 to Mostelac Enterprises (**Mostelac**) for $547,000 on January 18, 2007.  The Closing Agent conducted the closing for this transaction, as well as Cuebas' transaction.

32.   The Closing Agent obviously knew of the prior transaction between Mostelac and Morales because the Closing Agent closed this prior transaction.

33.   Despite having full knowledge of the prior transaction, the Closing Agent closed Cuebas' purchase without disclosing the prior transaction to IndyMac in writing, as IndyMac's closing instructions specifically required.

34.   Instead of properly notifying IndyMac of the prior transaction, the Closing Agent purposefully delayed recording the deed for the prior transaction until March 28, 2007, one month after the Closing Agent closed Cuebas' transaction.  The Closing Agent

delayed recording the deed so IndyMac could not discover the prior transaction before Cuebas' transaction closed.

35.    To complete the subterfuge, the Closing Agent designed two versions of the HUD-1 to disguise the true nature of Cuebas' transaction.  The Authorized HUD-1 was the only version of the HUD-1 the Closing Agent submitted to IndyMac prior to closing, and IndyMac relied on the Authorized HUD-1 to fund Cuebas' loans.

36.    The Closing Agent later sent a second version of the HUD-1 to IndyMac bundled with other closing documents, revealing Mostelac was the seller (**Concealed HUD-1**).

37.    IndyMac did not receive the Concealed HUD-1 until **after** it approved the Authorized HUD-1 and funded Cuebas' purchase.

38.    In short, the Closing Agent never notified IndyMac of the prior transaction between Morales and Mostelac according to the closing instructions before closing the Cuebas transaction.  Had the Closing Agent done so, IndyMac would not have funded Cuebas' purchase of Unit 1203.

39.    The Closing Agent's manipulation of the HUD-1s and the recording dates of the deeds for Unit 1203 demonstrates the Closing Agent never intended to comply with IndyMac's closing instructions when it signed the instructions and closed the Cuebas transaction.

40.    The Closing Agent was selected to close both transactions for the purpose of disguising the illicit transaction between Morales and Mostelac.  Without the Closing Agent's complicity, IndyMac would have learned of the January 18, 2007 transaction and would not have funded Cuebas' purchase.

41.    Mirabal, as president and director of Global Title, permitted Global Title to close the transaction despite the Closing Agent's direct and purposeful breaches of the closing

instructions.   By sanctioning the closing of Unit 1203, Mirabal failed to perform his duties as manager and sole principal.

42.     Mirabal, as president and director of Global Title, profited from Global Title's breaches. He received closing fees and additional compensation for disguising the prior transaction from IndyMac.

43.     Mirabal had a direct motive for allowing Global Title to improperly close the transaction for Unit 1203.  He expected to receive an increased volume of closings and extra fees in return for his compliance with the fraud scheme.

44.     Mirabal did not simply fail in his duties to properly supervise Global Title's employees. He actively participated in the scheme by notarizing the deeds for Unit 1203.  These are the same deeds that the Closing Agent delayed recording so IndyMac could not discover the transaction preceding Cuebas' purchase.  Following the scheme's design, Mirabal did nothing to ensure the deeds for Unit 1203 were timely recorded as IndyMac's closing instructions required.

45.     By authorizing the Cuebas transaction to close notwithstanding the Closing Agent's breaches, Mirabal acted in bad faith and in conscious disregard of the known risk that IndyMac would suffer harm, in the form of severely under-secured mortgage loans, from the closing of Unit 1203.

—THE TITLE INSURER—

46.     Attorneys' Title provided a CPL to IndyMac and its successors and/or assigns for Cuebas' transaction, which constituted a valid contract.  The CPL is attached as **EXHIBIT B**.

47.     The CPL requires Attorneys' Title to reimburse actual losses Plaintiff incurred from the closing of Unit 1203.  The letter states in pertinent part:

{JA468792;5}

> **Closing Protection Letter**
>
> Attorneys' Title Insurance Fund . . . hereby agrees to reimburse you for actual loss incurred by you in connection with such closings . . . when such loss arises out of:
>
> 1.     Failure of said Issuing Agent or Approved Attorney to comply with [IndyMac's] written closing instructions to the extent that they relate to (a) the status of the title to said interest in land or the validity, enforceability and priority of the lien of said mortgage on said interest in land . . . or (b) the obtaining of any other document specifically required by [IndyMac], but not to the extent that said instructions require a determination of the validity, enforceability or effectiveness of such other document, or (c) the collection and payment of funds due you, or
>
> 2.     Fraud or dishonesty of said Issuing Agent or Approved Attorney in handling your funds or documents in connection with such closing.

48.     IndyMac has a right to reimbursement of its actual losses for all of the reasons stated in this complaint which trigger coverage under the CPL. The Closing Agent, as Attorneys' Title's approved agent, failed to comply with IndyMac's written closing instructions by, among other things, failing to properly disclose the transaction between Morales and Mostalec in writing as IndyMac's closing instructions specifically required. The Closing Agent also committed fraud or dishonesty by knowingly closing both transactions for Unit 1203 in direct violation of the closing instructions.

49.     Attorneys' Title breached the CPL by refusing to reimburse Plaintiff for the actual losses Plaintiff incurred.

50.     Plaintiff gave timely notice to Attorneys' Title of the actual losses the Closing Agent caused Plaintiff on the loans described herein. To date, Attorneys' Title has refused to recognize Plaintiff's severely under-secured mortgage loans as actual losses.

{JA468792;5}

—THE INFLATED APPRAISAL—

51.    The Appraiser entered into a valid contract with 1st Continental to provide an appraisal of Unit 1203.  The appraisal is attached as **EXHIBIT C**.

52.    The Appraiser and 1st Continental intended for Plaintiff to be a beneficiary of this contract and for IndyMac to rely on the appraisal to fund Cuebas' purchase.

53.    Under the explicit terms of the appraisal, Plaintiff was fully entitled to rely on the appraisal as a secondary market participant in a mortgage finance transaction.   The certification in the appraisal states in pertinent part:

> 21. The lender/client may disclose or distribute this appraisal report to: … the mortgagee or its successors and assigns… other secondary market participants…without having to obtain the appraiser's or supervisory appraiser's (if applicable) consent.
>
> 23. [T]he mortgagee or its successors and assigns… and other secondary market participants may rely on this appraisal report as part of any mortgage finance transaction…

54.    The Appraiser was required to provide a credible appraisal that complied with regulatory requirements established for transactions funded through federally regulated financial institutions.   What the Appraiser ultimately prepared was an inaccurate appraisal that significantly overestimated the market value of Unit 1203.

55.    By signing the appraisal contract and conducting the appraisal, the Appraiser agreed to both contractual and fiduciary duties for the benefit of Plaintiff.  The appraisal states in pertinent part:

APPRAISER'S CERTIFICATION:   The appraiser certifies and agrees that:

3. I performed this appraisal in accordance with the requirements of the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of the Appraisal Foundation …

4. . . . I have adequate comparable market data to develop a reliable sales comparison approach for this appraisal assignment.

6. I researched, verified, analyzed, and reported on the prior sales of the comparable sales for a minimum of one year prior to the date of sale of the comparable sale, unless otherwise indicated in this report.

7. I selected and used comparable sales that are locationally, physically, and functionally the most similar to the subject property.

15. I have not knowingly withheld any significant information from this appraisal report and, to the best of my knowledge, all statements and information in this appraisal report are true and correct.

16. I stated in this appraisal report my own personal, unbiased, and professional analysis, opinions, and conclusions, which are subject only to the assumptions and limiting conditions in this appraisal report.

17. I have no present or prospective interest in the property that is the subject of this report, and I have no present or prospective personal interest or bias with respect to the participants in the transaction.

18. My employment and/or compensation for performing this appraisal or any future or anticipated appraisals was not conditioned on any agreement or understanding, written or otherwise, that I would report (or present analysis supporting) a predetermined specific value, a predetermined minimum value, a range or direction in value, a value that favors the cause of any party, or the attainment of a specific result or occurrence of a specific subsequent event (such as approval of a pending mortgage loan application).

56.     The supervisor appraiser, Roberto Rodriguez, additionally certified the work of his trainee, Lance Moyse, on the appraisal:

> 1. I directly supervised the appraiser for this appraisal assignment, have read the appraisal report, and agree with the appraiser's analysis, opinions, statements, conclusions, and the appraiser's certification.
>
> 2. I accept full responsibility for the contents of this appraisal report including, but not limited to, the appraiser's analysis, opinions, statements, conclusions, and the appraiser's certification.
>
> 4. This appraisal report complies with the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place at the time this appraisal report was prepared.

57.     In addition to the appraisal's terms, FLA. STAT. § 475.628 requires the Appraiser to comply with the Uniform Standards of Professional Appraisal Practice (**USPAP**).

58.     The Appraiser breached the appraisal contract and violated USPAP by providing an appraisal that grossly inflated the market value of Unit 1203. The actual value of the unit was approximately 33% less than the value estimated by the Appraiser.

—THE IMPROPERLY REPORTED SALES COMPARABLES—

59.     The Appraiser drastically inflated the value of Unit 1203 by selecting aged sales comparables that sold for uncharacteristically high values.

60.     The Appraiser chose sales comparables that were over six months old to support the inflated value for Unit 1203, while turning a blind eye to obviously superior comparables that sold in the same building within sixty days before the subject appraisal date.

61.     The Appraiser ignored the more recent comparables that did not support the inflated value the Appraiser reported in the appraisal. For example, unit 2401 in the Mark on

Brickell sold for $560,000 on January 12, 2007, approximately one month before the date of the appraisal report. Unit 1801, also in the Mark on Brickell, sold for $559,000 on February 9, 2007, approximately four days before completion of the subject appraisal.

62. Not only did the Appraiser improperly choose old comparables, but it also disregarded red flags demonstrating the aged comparables sold at inflated prices.

63. The Appraiser chose comparable #1, relying on its $825,000 sales price from July 2006, even though the property listed for $560,000 twice in the prior year. Although comparable #2 sold for $812,000 in September 2006, the property listed for $560,000 twice in the previous year.

64. The Appraiser also did not bother to adjust the price of comparable #3, which the Appraiser identified as necessary in the appraisal report. According to the Appraiser, the market warranted an adjustment to comparable #3 due to the difference in gross living area. The Appraiser never made this adjustment, instead basing the appraised value on the unadjusted sales price for comparable #3.

—THE MISLEADING SALES HISTORIES—

65. The Appraiser misrepresented the sales history for Unit 1203. The Appraiser reported the most recent sale of Unit 1203 occurred in February 2006, but neglected to mention Morales' sale of Unit 1203 to Mostelac for $547,000 on January 18, 2007.

66. The Appraiser also stated that Unit 1203 had not been offered for sale within the previous year, even though Unit 1203 was listed for sale at $530,000 on October 25, 2006.

67. Had the Appraiser disclosed the Morales sale to Mostelac or the October 2006 listing, IndyMac would have realized the Appraiser inflated the value of Unit 1203.

68.    The Appraiser knew that IndyMac, as the lender, would unknowingly rely on the inflated value in its appraisal.  IndyMac did in fact rely on the inflated value to fund Cuebas' purchase transaction, causing Plaintiff significant damages, including severely under-secured mortgage loans that will not be repaid by foreclosing the collateral.

## CLAIMS FOR RELIEF

### COUNT I — FRAUDULENT INDUCEMENT
### (THE CLOSING AGENT)

69.    Plaintiff realleges paragraphs 1 – 68.

70.    The Closing Agent made false statements of material fact, and failed to disclose material facts to IndyMac, in connection with IndyMac's funding of Cuebas' mortgage loans used to purchase Unit 1203.

71.    These false statements and omissions include, among others:  (a) failing to disclose the prior transaction between Morales and Mostelac involving Unit 1203; (b) providing IndyMac with a HUD-1 that misstated Morales was the seller of Unit 1203; and (c) concealing the Undisclosed HUD-1 from IndyMac.

72.    The Closing Agent intended that the representations induce IndyMac to act on them.

73.    The Closing Agent knew the representations were false at the time the representations were made to IndyMac.

74.    IndyMac reasonably and justifiably relied upon these representations.

75.    Plaintiff suffered damages, including severely under-secured mortgage loans that will not be repaid by foreclosing the collateral.

*Wherefore*, Plaintiff respectfully requests that the Court enter judgment in its favor awarding it damages, costs, attorney's fees, and such other relief this Court deems proper against Miguel Mirabal and Global Title.

{JA468792;5}

## COUNT II — NEGLIGENT MISREPRESENTATION
### (THE CLOSING AGENT)

76.     Plaintiff realleges paragraphs 1 – 68.

77.     The Closing Agent made inaccurate statements of material fact with respect to its closing of Cuebas' purchase of Unit 1203.

78.     The Closing Agent also failed to disclose material facts to Plaintiff with respect to its closing of Cuebas' purchase.

79.     These false statements and omissions include, among others:  (a) failing to disclose the prior transaction between Morales and Mostelac involving Unit 1203; (b) providing IndyMac with a HUD-1 that misstated Morales was the seller of Unit 1203; and (c) concealing the Undisclosed HUD-1 from IndyMac.

80.     The Closing Agent either knew its representations were false, made the misrepresentations without knowledge of their truth or falsity, or should have known the representations were false.

81.     The Closing Agent intended that IndyMac would rely upon and be induced by the misrepresentations to fund Cuebas' mortgage loans used to purchase Unit 1203.

82.     Plaintiff suffered damages, including severely under-secured mortgage loans that will not be repaid by foreclosing the collateral.

_Wherefore_, Plaintiff respectfully requests that the Court enter judgment in its favor awarding it damages, costs, attorney's fees, and such other relief this Court deems proper against Miguel Mirabal and Global Title.

## COUNT III — BREACH OF FIDUCIARY DUTY
### (THE CLOSING AGENT)

83.    Plaintiff realleges paragraphs 1 – 68.

84.    The Closing Agent assumed a duty to advise and/or protect IndyMac in this transaction by providing its professional services for which it received a fee.

85.    IndyMac relied on this trust and confidence in the performance of these professional services.

86.    The Closing Agent knew IndyMac, as well as its assigns and any purchasers of the mortgage loans on the secondary market, would rely upon and trust the HUD-1 to determine the value of the mortgage loans.

87.    The Closing Agent breached its fiduciary duty to IndyMac by, among other breaches:  (a) manufacturing the Approved HUD-1 that did not accurately reflect the seller of Unit 1203; (b) concealing the Undisclosed HUD-1 from IndyMac; and (c) failing to disclose the sale of Unit 1203 from  Morales to Mostelac.

88.    Plaintiff suffered damages as a result of the Closing Agent's breaches of fiduciary duty, including severely under-secured mortgage loans that will not be repaid by foreclosing the collateral.

*Wherefore*, Plaintiff respectfully requests that the Court enter judgment in its favor awarding it damages, costs, attorney's fees, and such other relief this Court deems proper against Miguel Mirabal and Global Title.

## COUNT IV — BREACH OF CONTRACT
### (THE CLOSING AGENT)

89.    Plaintiff realleges paragraphs 1 – 68.

90.  The Closing Agent entered into a valid contract with IndyMac in the form of the closing instructions to perform the closing of Cuebas' mortgage loan transaction.

91.  The Closing Agent breached this contract by failing to comply with the closing instructions by, among other violations:  (a) failing to disclose the transaction between Morales and Mostelac involving Unit 1203; (b) providing IndyMac with a HUD-1 that misstated Morales was the seller of Unit 1203; and (c) concealing the Undisclosed HUD-1 from IndyMac.

92.  Plaintiff suffered damages as a result of the Closing Agent's contract breaches, including severely under-secured mortgage loans that will not be repaid by foreclosing the collateral.

*Wherefore*, Plaintiff respectfully requests that the Court enter judgment in its favor awarding it damages, costs, attorney's fees, and such other relief this Court deems proper against Miguel Mirabal and Global Title.

## COUNT V — BREACH OF CONTRACT
### (ATTORNEYS' TITLE)

93.  Plaintiff realleges paragraphs 1 – 68.

94.  Attorneys' Title entered into a valid contract with IndyMac and its successors and/or assigns under the CPL.

95.  Attorneys' Title breached this contract by failing to comply with the terms of the CPL, including its failure to reimburse Plaintiff for its actual losses.

96.  Plaintiff suffered damages as a result of these contract breaches.

*Wherefore*, Plaintiff respectfully requests that the Court enter judgment in its favor awarding it damages, costs, attorney's fees, and such other relief this Court deems proper against Attorneys' Title.

### COUNT VI — NEGLIGENT MISREPRESENTATION
### (THE APPRAISER)

97.   Plaintiff realleges paragraphs 1 – 68.

98.   The Appraiser misrepresented that it chose the sales comparables most similar to Unit 1203 from the available sales comparables.

99.   The Appraiser also failed to disclose material facts to IndyMac, including the previous sales and listing prices of Unit 1203 and the sales comparables.

100.  The Appraiser's methods did not comply with the terms of the appraisal or USPAP.

101.  The Appraiser either knew the misrepresentations and omissions were false, made the misrepresentations without knowledge of their truth or falsity, or should have known the representations were false.

102.  The Appraiser intended that IndyMac would rely on and be induced by the misrepresentations and omissions to fund Cuebas' mortgage loans that she used to purchase Unit 1203.

103.  IndyMac justifiably relied on the Appraiser's misrepresentations and omissions by funding Cuebas' mortgage loans.

104.  Plaintiff suffered damages from IndyMac's justifiable reliance on the Appraiser's misrepresentations and omissions, including severely under-secured mortgage loans that will not be repaid by foreclosing the collateral.

{JA468792;5}

*Wherefore*, Plaintiff respectfully requests that the Court enter judgment in its favor awarding it damages, costs, attorney's fees, and such other relief this Court deems proper against Econo Appraisal, Roberto Rodriguez, and Lance Moyse.

**COUNT VII — NEGLIGENCE**
**(THE APPRAISER)**

105.   Plaintiff realleges paragraphs 1 – 68.

106.   The Appraiser owed a duty of care to IndyMac to provide an accurate and truthful appraisal so IndyMac could evaluate whether to fund the requested mortgage loans for Cuebas' purchase of Unit 1203.

107.   The Appraiser breached that duty of care by providing an inaccurate appraisal with an inflated value.

108.   The Appraiser also breached its duty to IndyMac by failing to disclose the improper methods the Appraiser used to appraise Unit 1203.  These methods did not comply with the terms of the appraisal or USPAP.

109.   The inaccurate and inflated appraisal proximately caused damages to Plaintiff, including severely under-secured mortgage loans that will not be repaid by foreclosing the collateral.

*Wherefore*, Plaintiff respectfully requests that the Court enter judgment in its favor awarding it damages, costs, attorney's fees, and such other relief this Court deems proper against Econo Appraisal, Roberto Rodriguez, and Lance Moyse.

## COUNT VIII — BREACH OF FIDUCIARY DUTY
### (THE APPRAISER)

110.   Plaintiff realleges paragraphs 1 – 68.

111.   The Appraiser assumed a duty to advise and/or protect IndyMac in this transaction by providing its professional services for which it received a fee.

112.   IndyMac relied on this trust and confidence in the performance of these professional appraisal services to fund Cuebas' purchase of Unit 1203.

113.   The Appraiser knew that IndyMac and its assignees, as well as any purchaser of the mortgage loans on the secondary market, would rely upon and trust its appraisal to determine the value of the mortgage loans.

114.   The Appraiser breached its fiduciary duty to IndyMac by preparing an inaccurate appraisal with an inflated value that did not comply with the specific terms of the appraisal or USPAP.

115.   Plaintiff suffered damages as a result of the Appraiser's breaches of fiduciary duty, including severely under-secured mortgage loans that will not be repaid by foreclosing the collateral.

*Wherefore*, Plaintiff respectfully requests that the Court enter judgment in its favor awarding it damages, costs, attorney's fees, and such other relief this Court deems proper against Econo Appraisal, Roberto Rodriguez, and Lance Moyse.

## COUNT IX — BREACH OF THIRD-PARTY BENEFICIARY CONTRACT
### (ECONO APPRAISAL)

116.   Plaintiff realleges paragraphs 1 – 68.

117.   Econo Appraisal and 1st Continental entered into a valid appraisal contract.

{JA468792;5}

20

118.    Under the terms of the contract, Econo Appraisal was required to provide an appraisal of the value of the Unit 1203 by accurately and truthfully stating its professional opinion in compliance with USPAP.

119.    IndyMac was not a named party to the appraisal contract.  IndyMac, however, was the intended beneficiary of the appraisal contract as the secondary market participant that funded the loans for Cuebas' purchase of Unit 1203.  Econo Appraisal and 1st Continental intended for IndyMac to rely on the appraisal to fund this transaction

120.    The Appraiser breached the contract by providing an inaccurate appraisal with an inflated sales price that did not comply with the specific terms of the appraisal or USPAP.

121.    Plaintiff suffered damages as a result of the Appraiser's contract breaches, including severely under-secured mortgage loans that will not be repaid by foreclosing the collateral.

*Wherefore*, Plaintiff respectfully requests that the Court enter judgment in its favor awarding it damages, costs, attorney's fees, and such other relief this Court deems proper against Econo Appraisal.


Date:  April 14, 2010

William P. Heller, Florida Bar No. 987263
e-mail:  william.heller@akerman.com
Justin E. Hekkanen, Florida Bar No. 33712
e-mail:  justin.hekkanen@akerman.com
**AKERMAN SENTERFITT**
350 East Las Olas Blvd., Suite 1600
Fort Lauderdale, Florida  33301
954-759-8945(ph)/954-463-2224 (fax)

*Counsel   for   Federal   Deposit   Insurance Corporation as Receiver for IndyMac Bank, FSB*

{JA468792;5}

21